UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

AQUINTA H. PALMER                                                    PLAINTIFF

V.                                            CIVIL ACTION NO. 3:22-CV-508-DPJ-FKB

JEREMY JEFFERSON, ET AL.                                           DEFENDANTS

ORDER

Plaintiff Aquinta H. Palmer brought this civil-rights action related to her arrest in

Jackson, Mississippi.  Defendants Hinds County and Jeremy Jefferson separately seek judgment

on the pleadings.  As explained below, those motions are granted to the extent that Palmer

waived certain claims.  The Court also grants Jefferson's motion as to Palmer's 42 U.S.C.

§ 1985(3) claim against him in his individual capacity, which is dismissed without prejudice.

Otherwise, the Court denies the motions.

I.      Facts and Procedural History

According to her Amended Complaint, Palmer and several friends visited the Vibe

nightclub in Jackson, Mississippi, on July 17, 2021.  When the evening ended and Palmer exited

Vibe, "she noticed numerous [Jackson Police Department] officers and their vehicles in the

parking lot."  Am. Compl. [3] ¶ 27.  Palmer also "saw that one of her friends was in handcuffs,

and JPD Officer Jeremy Jefferson was positioning himself to strike her."  *Id.*  "While keeping her

distance in a respectful manner, [Palmer] pled with Officer Jefferson not to strike her friend since

she was already handcuffed . . . ."  *Id.*

> Officer Jefferson then placed [Palmer's] friend in his patrol car, turned, walked
> toward [Palmer,] and, without warning or negotiation, pushed, shoved, and hit
> [Palmer] in her chest with both of his hands so violently that [Palmer's] entire
> body was literally knocked out of her shoes.  While screaming for [Palmer] to
> "have a good night," Officer Jefferson violently pushed [Palmer] a second time
> while waving his lethal baton towards [her.  Palmer] responded by placing her

> hands to her side and asking Officer Jefferson not to push her.  Officer Jefferson then got very close to [Palmer] and screamed as loudly as one could at [her,] "Get out of here!"  [Palmer] told Officer Jefferson she would leave, and that she wanted to leave, but she needed to retrieve her shoes which were on the ground in the parking lot.  Officer Jefferson then, without cause or jurisdiction, violently pushed [Palmer] in the chest for a third time.

*Id.* ¶ 28.  When Palmer went to retrieve her shoes, "she heard Officer Jefferson say to another JPD officer, 'She going to jail.'"  *Id.* ¶ 31.

> [Palmer] then saw Officer Jefferson coming towards her with handcuffs, and[,] afraid of being attacked again, she hid behind Officer Jane Doe pleading she had done nothing wrong.  Then Officer Jefferson, for no legitimate reason, severely grabbed [Palmer,] slammed her onto the hood of [her] car, and violently attempted to place handcuffs on [her] by placing all of his weight (250 pounds) atop [her.  Palmer] tried to resist being unjustifiably handcuffed, yet Officer Jefferson continued to wrestle [her] on the vehicle hood.  During this, Officer Jefferson verbally threatened [Palmer] by stating, "I wish you would.  I wish you would."

*Id.* ¶ 32.  Palmer claims she overheard Jefferson tell the other officers that "[s]he ha[d] to go to jail because [he, Jefferson,] pushed her first."  *Id.* ¶ 43.  Neither Jefferson nor another arresting officer could tell Palmer what they were charging her with.  *Id.* ¶ 44.

Jefferson ultimately brought Palmer to a local emergency room for treatment.  He then took her to Hinds County's Raymond Detention Center (RDC) "and immediately left without giving jail personnel any instructions."  *Id.* ¶ 45.  Palmer

> remained in [RDC] for three days, during which time she was mug shot, fingerprinted, booked, and given an extensive, invasive cavity search.  [She] saw people at the jail whom she knew, causing her great embarrassment and permanent damage to her reputation.  The female holding cell was visible from the male holding cells, and [Palmer] was subjected to threatening, sexual, verbal abuse from the male detainees.  [She] was also subjected to sexual advances by the women in the holding cell which was very scary for [her.]

*Id.*  When her case proceeded to trial, all charges were dismissed.  *Id.* ¶ 47.

Palmer sued Hinds County, Jefferson in his official and individual capacities, and others on September 1, 2022.  She says Defendants violated her constitutional rights under the First,

Fourth, Fifth, Eighth, and Fourteenth Amendments and conspired to interfere with her civil rights.  Hinds County and Jefferson (in his individual capacity) now seek judgment on all claims against them.  Palmer responded to both motions, but only Hinds County filed a reply.

## II.    Standard

Because both Defendants filed their motions after answering the Complaint, their motions fall under Federal Rule of Civil Procedure 12(c).  When considering such motions, the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)).  To overcome a Rule 12(c) motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id*. at 555 (citations and footnote omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  It follows that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "This standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements."  *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (citing *Twombly*, 550 U.S. at 556).

III.     Analysis

A.       Jefferson's Motion

Palmer pleaded several federal claims against Jefferson, but her response to his motion addresses only retaliatory detention/arrest under the First Amendment and unlawful arrest, excessive force, and conspiracy under the Fourth Amendment.  She left the rest unaddressed and therefore abandoned them.  *See Black v. N. Panola Sch. Dist.*, 561 F.3d 584, 588 n.1 (5th Cir. 2006) (noting that plaintiff's "failure to pursue [a] claim beyond her complaint constituted abandonment").  The Court dismisses the abandoned claims.

As for the remaining claims, all but conspiracy fall under 42 U.S.C. § 1983.  That statute provides a claim against any "person" who, "under color of" state law, deprives another of his or her constitutional rights.  *Id.*

Jefferson says those claims should be dismissed because he is entitled to qualified immunity.  Qualified immunity shields officials from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  It gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant raises qualified immunity, courts "apply a two-part test:  (1) whether the plaintiff has alleged a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the violation."  *Wallace v. Taylor*, No. 22-20342, 2023 WL 2964418, at *3 (5th Cir. Apr. 14, 2023) (citing *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir.

2016)).  With this framework in mind, the Court addresses Palmer's § 1983 claims against

Jefferson.

> 1. First Amendment Retaliatory Detention/Arrest

"[A]s a general matter the First Amendment prohibits government officials from

subjecting an individual to retaliatory actions" for engaging in protected speech.  *Nieves v.*

*Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

"If an official takes adverse action against someone based on [a retaliatory] motive, and 'non-

retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured

person may generally seek relief by bringing a First Amendment claim."  *Id.* (quoting *Hartman*,

547 U.S. at 256).

Jefferson says Palmer fails to state a First Amendment claim because she never alleges

that she engaged in protected speech or that her arrest was causally related to any retaliatory

animus.  Starting with the protected-speech issue,

> the Supreme Court cogently stated in *City of Houston . . . v. Hill*, 482 U.S. 451,
> 461 . . . (1987), [that] "the First Amendment protects a significant amount of
> verbal criticism and challenge directed at police officers."  "The freedom of
> individuals verbally to oppose or challenge police action without thereby risking
> arrest is one of the principal characteristics by which we distinguish a free nation
> from a police state."  [*Id.*] at 462–63 . . . .

*Enlow v. Tishomingo County*, 962 F.2d 501, 509 (5th Cir. 1992); *see also Nowell v. City of*

*Cincinnati*, 414 U.S. 14, 16 (1973) ("Surely, one is not to be punished for nonprovocatively

voicing his objection to what he obviously felt was a highly questionable detention by a police

officer.").

Palmer alleges that "[w]hile keeping her distance in a respectful manner, [she] pled with

Officer Jefferson not to strike her friend since she was already handcuffed, and that it was her

friend's birthday." Am. Compl. [3] ¶ 27. Jefferson never explains why this doesn't qualify as protected speech, and the Court finds a plausible claim that it does.

Turning to causation, Palmer "must plead that [Jefferson] would not have [arrested her] absent [her] protected speech." *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1151 (5th Cir. 2021) (citing *Nieves*, 139 S. Ct. at 1722). Jefferson argues that Palmer cannot establish causation because, even assuming protected speech, she "fails to establish an absence of probable cause for an arrest." Jefferson Mem. [23] at 8; *see Gonzalez v. Trevino*, 42 F.4th 487, 492 (5th Cir. 2022) ("[I]n retaliatory prosecution cases a plaintiff must plead and prove the absence of probable cause for the underlying criminal charge.").

Although Jefferson says he had probable cause to arrest Palmer, this portion of his argument never identifies the crime for which he had probable cause. That said, his Fourth Amendment analysis contends that Palmer engaged in disorderly conduct under Mississippi Code section 97-35-7(1), which seems to be the best fit for the facts Jefferson addresses in this section of his brief. That statute provides:

> Whoever, with intent to provoke a breach of the peace, or under such circumstances as may lead to a breach of the peace, or which may cause or occasion a breach of the peace, fails or refuses to promptly comply with or obey a request, command, or order of a law enforcement officer, having the authority to then and there arrest any person for a violation of the law, to:
>
> (a) Move or absent himself and any vehicle or object subject to his control from the immediate vicinity where the request, command or order is given, or
>
> . . . .
>
> (i) Act or do or refrain from acting or doing as ordered, requested or commanded by said officer to avoid any breach of the peace at or near the place of issuance of such order, request or command, shall be guilty of disorderly conduct, which is made a misdemeanor and, upon conviction thereof, such person or persons shall be punished by a fine of not more than Five Hundred Dollars ($500.00) or imprisonment in the county jail for not more than six (6) months, or by both such fine and imprisonment.

6

To prove Palmer violated the statute, the State would have to show:

> (1) [Palmer]—with the intent to provoke a breach of the peace, or under circumstances as may lead to a breach of the peace, or which may cause or occasion a breach of the peace—refused to promptly comply with or obey a request, command, or order to act or do or refrain from acting or doing something; (2) the purpose of the request, command, or order was to avoid a breach of the peace; (3) the person giving the command was a law-enforcement officer; and (4) the law-enforcement officer—at the time of giving the command, order, or request—had the authority to then and there arrest h[er] for a violation of the law.

*Mastin v. State*, 180 So. 3d 732, 737 (Miss. Ct. App. 2015) (en banc).

To determine whether probable cause existed to arrest Palmer for disorderly conduct, the Court "examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Orneals v. United States*, 517 U.S. 690, 696 (1996)).

Jefferson says probable cause existed to arrest Palmer because she "interfered with a lawful arrest and with law enforcement action which required the presence of numerous officers and vehicles." Jefferson Mem. [23] at 9. He then says: "Read most charitably to Plaintiff, Officer Jefferson approached and ultimately detained Plaintiff as a result of her interference in legitimate law enforcement actions. Plaintiff's defense for doing so is that it was the birthday of her detained friend." *Id.*

That characterization omits key facts. In her Amended Complaint, Palmer avers that while keeping "her distance in a respectful manner," Palmer pleaded "with Officer Jefferson not to strike her friend since she was already handcuffed." Am. Compl. [3] ¶ 27. Striking a restrained suspect would potentially violate the Fourth Amendment and be unlawful. And despite Palmer's "respectful manner," Jefferson then walked toward Palmer and shoved her so hard she came out of her shoes. *Id.* ¶ 28. Palmer maintains that she "was not engaged in any

activity that gave Defendant Jefferson reason to believe she was in violation of any law." *Id.*
¶ 29.  And the only verbal command Palmer failed to immediately heed was Jefferson's
instruction that she "[g]et out of here." *Id.* ¶ 28.  That instruction came after Jefferson had twice
shoved Palmer for no apparent reason. *Id.*  Even then, she said she would comply after retrieving
her shoes. *Id.*  Palmer also claims that Jefferson told other officers at the scene that Palmer had
to go to jail because he "pushed her first." *Id.* ¶ 43.

Taking Palmer's allegations as true, there is a fact question whether a "reasonable officer
could have concluded [Palmer] had an 'intent to provoke a breach of the peace,' or that
circumstances were such as might lead to, or cause or occasion a breach of the peace" when she
intervened for her restrained friend and then failed to immediately comply with Jefferson's
verbal command. *Harris v. Dobbins*, No. 3:22-CV-479-TSL-MTP, 2023 WL 2899994, at *8
(S.D. Miss. Apr. 11, 2023) (quoting Miss. Code Ann. § 97-35-7(1)(i)); *accord Ducksworth v.
Landrum*, 62 F.4th 209, 217–18 (Oldham, J., concurring in part) (concluding that officers lacked
probable cause to arrest plaintiff under section 97-35-7 where plaintiff "had done nothing to
evince intent to breach the peace" and "[t]he officers had no authority to arrest [plaintiff] when
[they] ordered him to leave"); *see also Jones v. State*, 798 So. 2d 1241, 1247–48 (Miss. 2001)
(holding that defendant's profane remarks to police officer could not have given officer reason to
believe that breach of peace had occurred).

So the final question is whether Jefferson's alleged conduct violated a clearly established
right.  "For a right to be clearly established, the contours of the right must be sufficiently clear
that a reasonable official would understand that what he is doing violates that right.'" *Turner v.
Lieutenant Driver*, 848 F.3d 678, 685 (5th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S.
635, 640 (1987)).  "Ultimately, '[t]he dispositive question is whether the violative nature of the

particular conduct is clearly established.'" *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Palmer meets that test. Supreme Court and Fifth Circuit precedent clearly establishes that an officer violates the First Amendment if he arrests someone in retaliation for protected speech. *See Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (finding question of fact that precluded summary judgment and holding arrest without probable cause based on protected speech violates First Amendment) (citing *Hill*, 482 U.S. at 462–63). Palmer has alleged that Jefferson violated her clearly established rights. Her First Amendment claim survives Jefferson's qualified-immunity defense at the Rule 12 stage.

2.    Unlawful Arrest

"An arrest is unlawful unless it is supported by probable cause." *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004). Jefferson says Palmer's Fourth Amendment claim fails because a reasonable police officer could have believed he had probable cause to arrest Palmer under the circumstances. To the extent that this argument overlaps his First Amendment argument—for example on disorderly conduct—the Court must reject it. But this time, he goes further, describing facts he believes created probable cause to arrest Palmer for resisting arrest.

Whether the pleaded conduct constitutes resisting arrest falls under Mississippi Code section 97-9-73:

> It shall be unlawful for any person to obstruct or resist by force, or violence, or threats, or in any other manner, his lawful arrest or the lawful arrest of another person by any state, local or federal law enforcement officer, and any person or persons so doing shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not more than Five Hundred Dollars ($500.00), or by imprisonment in the county jail not more than six (6) months, or both.

But "[t]he offense of resisting arrest presupposes a lawful arrest. A person has a right to use reasonable force to resist an unlawful arrest." *Brendle v. City of Houston*, 759 So. 2d 1274, 1284

9

(Miss. Ct. App. 2000) (quoting *Taylor v. State*, 396 So. 2d 39, 42 (Miss. 1981)); *see Coleman v. Marion County*, No. 2:14-CV-185-DPJ-FKB, 2015 WL 5098524, at *11 (S.D. Miss. Aug. 31, 2015) ("The Mississippi Supreme Court has long held that a citizen may resist his own unlawful arrest.").

Jefferson says probable cause existed to arrest Palmer for resisting arrest because "when [he] approached Plaintiff to arrest her, her resistance was such that three other officers tased [Palmer] and 'got on top of' her to effect the arrest." Jefferson Mem. [23] at 11. But Jefferson omits the facts suggesting that the arrest was unlawful before officers "got on top of her." *Id.* According to Palmer, when she promised to leave after collecting her shoes, Jefferson announced that she was "going to jail," Am. Compl. [3] ¶ 31, approached her aggressively, and, "for no legitimate reason, severely grabbed Plaintiff, slammed her onto the hood of [her] car," and handcuffed her, *id.* ¶ 32. "[S]uddenly and for no legitimate reason" Officer Doe Drain tased Palmer (who was already restrained) while another officer "was attempting to help [her] from the hood of the vehicle." *Id.* ¶ 33. Palmer apparently fell to the ground "completely incapacitated," yet Drain tased her twice more. *Id.* Jefferson may tell a different story, but the fact that Palmer was tased does not necessarily mean probable cause existed to arrest her for resisting. *Brendle*, 759 So. 2d at 1284.

As noted, the Court must view these facts in the light most favorable to Palmer. *Martin K. Eby Constr. Co.*, 369 F.3d at 467. As a result, Palmer has stated a claim that Jefferson violated her rights under the Fourth Amendment. And "[t]he Fourth Amendment right to be free from false arrest—arrest without probable cause—was clearly established at the time of

[Palmer's] arrest[]." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009).  The

unlawful-arrest claim survives Jefferson's qualified-immunity defense at the Rule 12 stage.[1]

### 3.    Excessive Force

"To state a violation of the Fourth Amendment prohibition on excessive force, a plaintiff

must allege '(1) an injury that (2) resulted directly and only from the use of force that was

excessive to the need, and that (3) the force used was objectively unreasonable.'"  *Hogan v.*

*Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (quoting *Flores*, 381 F.3d at 396).

> The objective reasonableness of the force depends on the facts and circumstances
> of the particular case—the need for force determines how much force is
> constitutionally permissible.  The court should consider "the severity of the crime
> at issue, whether the suspect poses an immediate threat to the safety of the
> officers or others, and whether he is actively resisting arrest or attempting to
> evade arrest by flight."

*Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Finally,

> [t]he "reasonableness" of a particular use of force must be judged from the
> perspective of a reasonable officer on the scene, rather than with the 20/20 vision
> of hindsight. . . .  The calculus of reasonableness must embody allowance for the
> fact that police officers are often forced to make split-second judgments—in
> circumstances that are tense, uncertain, and rapidly evolving—about the amount
> of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97.

Jefferson says Palmer hasn't alleged an excessive-force claim because he acted

reasonably under the circumstances in "shoving," "grabbing," and "slamming [Palmer] against

her car and leaning against her in his efforts to handcuff her."  Jefferson Mem. [23] at 13.

---

[1] Palmer says Jefferson refused to tell her the charges when he arrested her.  Am. Compl. [3]
¶ 44.  She also claims that Jefferson told others at the scene that she had to go to jail because he
"pushed her first."  *Id.* ¶ 43.  While an objective standard applies under the Fourth Amendment,
these facts might reflect that Jefferson knew no facts supporting probable cause.  *Cf. Richardson
v. Bonds*, 860 F.2d 1427, 1431 (7th Cir. 1988) (explaining that "arresting officer's subjective
knowledge of *facts* sufficient to constitute probable cause is central to evaluation of the propriety
of an arrest").

Jefferson says the force he used was reasonable because he "was in the middle of dealing with a law enforcement situation serious enough to require the presence of numerous officers and vehicles, late at night at a bar, and where he had just arrested a close friend of [Palmer's]." *Id.* at 13–14.

But considering Palmer's alleged facts and applying the *Graham* factors, the Court finds a question of fact on Palmer's excessive-force claim. As explained above, Palmer plausibly pleaded that Jefferson lacked probable cause to believe she had engaged in any criminal conduct. She posed no apparent danger to Jefferson or others; she simply asked Jefferson not to hit her handcuffed friend. Nor was she actively resisting arrest or trying to flee when Jefferson shoved her "in her chest with both of his hands so violently that [Palmer's] entire body was literally knocked out of her shoes." Am. Compl. [3] ¶ 28.

Again, Jefferson will likely present a different version, but on a Rule 12 motion, the Court must accept the facts in the Amended Complaint. Palmer has alleged that Jefferson violated her clearly established right to be free from excessive force. *See Hanks v. Rogers*, 853 F.3d 738, 747–48 (5th Cir. 2017) (finding "abrupt application of physical force rather than continued verbal negotiating . . . clearly unreasonable and excessive" as applied to "an individual stopped for a minor traffic offense [who] offer[ed], at most, passive resistance and present[ed] no threat or flight risk" (footnote omitted)).

3.    Conspiracy

Palmer says Jefferson conspired with others to intimidate her and violate her rights. She therefore asserts claims under 42 U.S.C. §§ 1985(2) and (3) and 1986. *See* Am. Compl. [3] Count VIII. Section 1985(2) addresses conspiracies to obstruct justice by intimidating a party or witness. Section 1985(3) addresses conspiracies "motivated by a class-based animus." *Hilliard*

*v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) (citing *Burns-Toole v. Byrne*, 11 F.3d 1270, 1276 (5th Cir.), *cert. denied*, 512 U.S. 1207 (1994)).  And "Section 1986 provides for recovery against anyone 'who, having knowledge that [a § 1985 conspiracy is] about to be committed,' does nothing about it."  *Welsh v. Correct Care Recovery Sols.*, 845 F. App'x 311, 325 (5th Cir.), *cert. denied*, 142 S. Ct. 438 (2021).

Jefferson starts with § 1985(2), arguing that the Amended Complaint lacks facts showing that he conspired with others "to accomplish any of the [statute's] stated prohibitions."  Jefferson Mem. [23] at 15.  But he never explains which prohibitions he addresses, and the statute addresses two:  prohibitions against interfering with state proceedings and prohibition against interfering with federal proceedings.  The two have different elements.  For state proceedings, a plaintiff mush show "intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the law." 42 U.S.C. § 1985(2).  In other words, a plaintiff must show intent to discriminate.  But when addressing interference with federal proceedings, § 1985(2) does not require intent to discriminate.  *See Kush v. Rutledge*, 460 U.S. 719, 726 (1983) (explaining that § 1985(2) requires no intent to discriminate when addressing federal courts).

Witnessing an alleged constitutional violation is something that could plausibly implicate federal proceedings, so no intent to discriminate would be required.  *Id.*  And, as Palmer argues in response—with no reply from Jefferson—the Amended Complaint pleads facts plausibly suggesting an agreement to interfere or intimidate.  *See* Pl.'s Mem. [31] at 16–18. Absent deeper argument from Jefferson, this part of the claim survives.

Jefferson next turns to § 1985(3), which addresses conspiracies "motivated by a class-based animus." *Hilliard*, 30 F.3d at 653 (citing *Burns-Toole*, 11 F.3d at 1276).  To establish a claim under § 1985(3), a plaintiff must show that "(1) a racial or class-based discriminatory animus lay behind the conspiracy and (2) the conspiracy aimed to violate rights protected against private infringement." *Young v. Isola ex rel. Miller*, 708 F. App'x 152, 157 (5th Cir. 2017) (quoting *Horaist v. Dr.'s Hosp. of Opelousas*, 255 F.3d 261, 270 (5th Cir. 2001)).

Jefferson says:  "No factual allegation charges Jefferson with conspiring with any other individual to accomplish any of the stated prohibitions of 42 U.S.C. § 1985(3)."  Jefferson Mem. [23] at 15.  While that's all he offers, Jefferson has said enough to put Palmer on notice because § 1985(3)'s singular focus is preventing conspiracies to discriminate based on race or class. *Young*, 708 F. App'x at 157.  And Palmer acknowledges that requirement in her response, arguing that she has stated a claim because she is "an African-American woman" who was denied "the equal protection of laws."  Pl.'s Mem. [31] at 18.  But membership in a protected class is not enough to state a claim for race-based discrimination. *Ling v. City of Garland*, No. 3:05-CV-1754, 2006 WL 148736, at * (N.D. Tex. Jan. 18, 2006).  Nor is Palmer's conclusory argument that Jefferson violated her right to equal protection. *See Twombly*, 550 U.S. at 557. Because Palmer identifies no facts in her Amended Complaint plausibly suggesting that Jefferson was motivated by racial animus, her § 1985(3) claim must be dismissed.

That said, a court should not dismiss a claim "without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (citation omitted).  Palmer may therefore seek leave to amend her pleadings to factually plead race-based discrimination.

That leaves the claim under § 1986.  "[A] valid § 1985 claim is a prerequisite to a § 1986 claim."  *Bryan v. City of Madison*, 213 F.3d 267, 276 (5th Cir. 2000).  Here, there is no valid claim under § 1985(3), but Palmer has stated a claim under § 1985(2).  The § 1986 claim survives to that limited extent.

B.      Hinds County

Jefferson deposited Palmer at Hinds County's detention center, RDC, where she says the attacks on her constitutional rights continued.  As with Jefferson, she pleaded several claims against Hinds County, including many that are meritless.  But in her response to the County's motion, she pressed only a Fourth Amendment due-process claim based on her conditions of confinement and an unreasonable-search claim related to the strip search the County performed when she arrived.  The Court considers the other claims pleaded against Hinds County abandoned.  *See Black*, 561 F.3d at 588 n.1.

1.      Conditions of Confinement

"When a [pretrial-detainee] plaintiff challenges conditions of confinement, 'the proper inquiry is whether those conditions amount to punishment of the detainee.'"  *Estate of Bonilla ex rel. Bonilla v. Orange County*, 982 F.3d 298, 308 (5th Cir. 2020) (quoting *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019)).  Thus, to prove a conditions-of-confinement claim, a plaintiff must show "(1) a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . ; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [her] constitutional rights."  *Cadena v. El Paso County*, 946 F.3d 717, 727 (5th Cir. 2020) (quoting *Duvall v. Dallas County*, 631 F.3d 203, 207 (5th Cir. 2011)).

Proving such a claim is difficult.  *Shepherd v. Dallas County*, 591 F.3d 445, 449 (5th Cir. 2009).  "[A] detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights."  *Bonilla*, 982 F.3d at 309 (quoting *Shepherd*, 591 F.3d at 454).  Basic human needs include, for example, "food, clothing, shelter, medical care, and reasonable safety."  *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Serv.*, 489 U.S. 189, 200 (1989)).

To hold Hinds County liable under § 1983 for unconstitutional conditions of confinement, Palmer must show (1) a policymaker; (2) an official policy or custom or a de facto policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

> Similar to custom, a *de facto* policy is defined as a persistent widespread practice that, although not authorized by an officially adopted policy, is so common and well settled as to constitute a custom that fairly represents a municipal policy.  *See Webster v. City of Houston*, 735 F. 2d 838, 842 (5th Cir. 1984).  "[I]solated acts" cannot establish the existence of a custom or practice.  *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).  Instead, prior incidents "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectional conduct is the expected, accepted practice."  *Webster*, 735 F.2d at 842.

*Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 752 (5th Cir. 2023).

Palmer asserts that the County maintained a de facto policy of punishing inmates through unconstitutional conditions.  *See* Pl.'s Resp. [28] at 1.  To state her claim, she pleaded examples of allegedly unconstitutional conditions she faced and offered a more general indictment of RDC.

To begin, Palmer says that housing misdemeanant pretrial detainees with convicted violent inmates violated her constitutional rights.  *See* Am. Compl. [3] ¶ 81 (complaining that "she was placed in general population"); *id.* ¶ 120 ("Hinds County . . . knew that placing [Palmer] in general population in RDC [was] unconstitutional . . . ."); Pl.'s Resp. [28] at 2.  This initial assertion plausibly states a constitutional violation.

"[T]he confinement of pretrial detainees indiscriminately with convicted persons is unconstitutional unless such a practice is 'reasonably related to the institution's interest in maintaining jail security,' or physical facilities do not permit their separation."  *Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir. 1981) (quoting *Bell v. Wolfish*, 441 U.S. 520, 531 (1979)), *overruled on other grounds by Int'l Woodworkers of Am., AFL-CIO v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986); *see Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 n.5 (5th Cir. 2017) (finding plaintiff had "alleged a violation of the rule against housing pretrial detainees with DOC inmates" and that "nothing suggests that an exception to the rule applies"); *Jones v. Dallas County*, No. 21-10617, 2022 WL 3334493, at *3 (5th Cir. Aug. 12, 2022) (reversing dismissal of § 1983 claim where pretrial detainee alleged that he was housed with and treated the same as convicted inmates).  Hinds County may have a defense to this claim, but at the pleading stage, Palmer plausibly states a constitutional violation under *Diamond*.

Palmer makes other assertions that add to a plausible conditions-of-confinement claim.  According to Palmer, "[t]he female holding cell was visible from the male holding cells, and Plaintiff was subjected to threatening, sexual, verbal abuse from the male detainees."  Am. Compl. [3] ¶ 45.  That allegation, and her assertion that cellmates sexually harassed her, seem to relate to her averment that "[j]ail staffing is poor, with insufficient numbers of trained and

experienced staff to supervise prisoners." *Id.* ¶ 21. She also noted security deficiencies related to the locks and cameras. *Id.* ¶ 17(J).

The County correctly notes, however, that to make a conditions-of-confinement claim there must "be a pervasive pattern of serious deficiencies in providing for her basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights." *Bonilla*, 982 F.3d at 309. And to show a de facto policy—as Palmer alleges—for municipal liability, there must be a "widespread practice that, although not authorized by an officially adopted policy, is so common and well settled as to constitute a custom that fairly represents a municipal policy." *Guillot*, 59 F.4th at 752.

To meet those burdens, Palmer relies heavily on *United States v. Hinds County*, a separate civil action over the conditions at RDC. The United States filed that suit in 2016, and a consent decree was adopted that same year. *See* Compl. [3-1]; Decree [3-4]. Five years later, in November 2021, United States District Court Judge Carlton Reeves issued a show-cause order finding that conditions had not improved. He noted:

- The grand jury concluded that RDC was "in a deplorable condition and inadequately staffed."

- The U.S. Dept. of Justice's Civil Rights Division investigated conditions at RDC and concluded that the County was violating the Eighth and Fourteenth Amendments by, among other things described in its 29-page report, failing to provide "minimum levels of protection from violence," failing to have "sufficient numbers of trained staff," and incarcerating persons "beyond their court-ordered release dates."

- Mississippi Department of Corrections removed all state inmates from RDC due to the deplorable conditions.

- During 2021 there were a "record number of fights and assaults at RDC . . . there continue to be fires set by inmates, there is an extremely large amount of contraband in the facility including drugs, there have been a number of overdoses . . . and there have been three deaths, two by suicide."

- Entire housing units at RDC are routinely left unattended.

- Chronic and severe understaffing has resulted in "a continuing series of major maintenance problems as inmates destroy the work of County and contract personnel almost as fast as it is completed."

- "[T]here is no fire alarm system in the facility, no sprinkler system in the inmate housing areas of RDC . . .", and inmates regularly set fires.

- "It has long been known that many of the security doors and locks at RDC are not functional."

- There is a proliferation of "trash dumpster cells" that serve "as a breeding ground for vermin."

Pl.'s Mem. [28] at 4–5 (quoting Order [3-7] at 6, 7, 10, 19, 20, 21) (footnotes omitted). Palmer incorporated the consent decree and Judge Reeves's order in her Amended Complaint, so they are part of the record under Rule 12. *See* Decree [3-4], Order [3-7].

The County says the Court may not consider *United States v. Hinds County* for three reasons. First, it notes that the consent decree in that case precluded any third-party-beneficiary claims. County Reply [32] at 6 (citing Decree [3-4] ¶ 123). It does, but that's not what Palmer seeks. She cites the decree and Judge Reeves's order to prove deficiencies in 2016 that the County failed to remedy by November 2021—longstanding deficiencies in providing basic human needs and a de facto policy to punish.

Second, the County says the decree is inadmissible under Federal Rules of Evidence 403, 404, 408, and 802. County Reply [32] at 6 (citing *Wesley ex rel. Wesley v. Armor Corr. Health Serv., Inc.*, No. 19-CV-918, 2022 WL 16748861 (E.D. Wis. Nov. 7, 2022)). Whether those rules preclude this evidence is debatable and underdeveloped because the County made this argument in its reply. *See Gillaspy v. Dall. Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008) ("It is the practice of this court and the district courts to refuse to consider arguments raised for the first time in reply briefs."). Even so, the County's authority for this argument, *Wesley*, was decided at

the summary-judgment stage when Rule 56(c)(2) allows a party to object if the opponent relies on facts that admissible evidence cannot support. Rule 12(c) has no similar restriction, and the Court must accept the well-pleaded facts as true.

Third, the County observes that Palmer was never attacked and her alleged mistreatment is different from the conditions Judge Reeves noted. Thus, no "direct link" exists between her alleged injuries and the constitutional deprivations found in the other case. County Reply [32] at 8 (quoting *Jordan v. Gautreaux*, No. CV 21-48-JWD-SDJ, 2023 WL 1491213, at *1 (M.D. La. Feb. 2, 2023)). True enough, Palmer does not allege that she suffered from every condition the consent decree addressed. But plausibility is the question under Rule 12(c), and Palmer's general theory is that the conditions were so deplorable for so long that they amounted to a de facto policy to punish.

In any event, *United States v. Hinds County* did address conditions Palmer alleges here. For example, Palmer says the women inmates were visible to the male inmates and that she was "subjected to threatening, sexual, verbal abuse by the male detainees." Am. Compl. [3] ¶ 45. The complaint in *United States v. Hinds County* made a similar allegation: "[F]emale prisoners are not adequately separated by sight or sound from adult, male prisoners." Compl. [3-1] ¶ 27. Thus, if Palmer's allegations are true—and the Court must assume they are—Hinds County kept placing men close enough to see and harass female prisoners five years after receiving notice of the alleged violation. *See* Am. Compl. [3] ¶ 45. Palmer also complains that chronic understaffing contributed to cause the harassment she allegedly endured. *Id.* ¶ 23. The United States made the same claim in 2016. *See* Compl. [3-1] ¶ 21 (alleging that "[j]ail staffing is poor, with insufficient numbers of trained and experienced staff to supervise prisoners"). By November 2021—four months after Palmer's detention—Judge Reeves noted that conditions had

not improved and entire housing units at RDC "are routinely left unattended."  Order [3-7] at 19.
These observations about understaffing and harassment by male prisoners may also relate to the
concern that the locks at RDC failed to detain the inmates.

All that aside, Palmer acknowledges that she was never attacked but says her rights were
still violated.  Pl.'s Resp. [28] at 6–7.  Palmer bases that argument on *Woodhous v.
Commonwealth of Virginia*, where the Fourth Circuit held:  "A prisoner has a right, secured by
the eighth and fourteenth amendments, to be reasonably protected from constant threat of
violence and sexual assault by his fellow inmates, and he need not wait until he is actually
assaulted to obtain relief."  487 F.2d 889, 890 (4th Cir. 1973).  Though *Woodhous* addressed the
Eighth Amendment, "a pretrial detainee's due process rights are said to be 'at least as great as the
Eighth Amendment protections available to a convicted prisoner.'"  *Hare*, 74 F.3d at 639
(quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  Hinds County never
addressed *Woodhous* in its reply, and *Woodhous* does not stand alone.  *See, e.g.*, *Benefield v.
McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001); *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir.
1985); *Leonardo v. Moran*, 611 F.2d 397, 399 (1st Cir. 1979).  The *Woodhous* argument merely
adds weight, and because the County has not yet addressed it, the Court will not rely on that
theory at this point.

The County also argues that "if a particular condition or restriction of pre-trial detention
is reasonably related to a legitimate governmental objective, it does not, without more, amount to
punishment."  County Reply [32] at 4 (citing *Diamond*, 636 F.2d at 1369).  Assuming that's true,
it is at least plausible that no legitimate governmental objective exists given the consent decree
and Judge Reeves's finding that RDC continued to operate in an unconstitutional way.  In
addition, when a pretrial detainee shows "a series of 'acts or omissions . . . sufficiently extended

or pervasive'" a jury may "reasonably presume that the government acted with the requisite

intent to punish." *Shepherd*, 591 F.3d at 455 (quoting *Hare*, 74 F.3d at 645).

In sum, the Court's review at the pleading stage is limited.  The Rule 12(c) "standard

'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence

of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d at 587.  And

here, the collective pleadings "nudge[ Palmer's] claims across the line from conceivable to

plausible." *Twombly*, 550 U.S. at 570.  Palmer's conditions-of-confinement claim is plausible.

        2.      Strip Search

Palmer says the strip search she endured when she arrived at RDC was unlawful.  The

Supreme Court considered a similar issue in *Florence v. Board of Chosen Freeholders*, 566 U.S.

318 (2012).

> The *Florence* Court held that "a regulation impinging on an inmate's
> constitutional rights must be upheld 'if it is reasonably related to legitimate
> penological interests.'"  [566 U.S. at 326] (quoting *Turner v. Safley*, 482 U.S. 78,
> 89 . . . (1987)).  The Court further stressed the deference owed to correctional
> officials in designing search policies intended to ensure security, noting that, "in
> the absence of substantial evidence in the record to indicate the officials have
> exaggerated their response . . . courts should ordinarily defer to their expert
> judgment in such matters." *Id.* at [328] (quoting *Block v. Rutherford*, 468 U.S.
> 576, 584–85 . . . (1984)). . . .   The Court concluded that, in the correctional
> context, the burden is on the plaintiff to prove with substantial evidence that the
> challenged search does not advance a legitimate penological interest.

*Mabry v. Lee County*, 849 F.3d 232, 236 (5th Cir. 2017).  Ultimately, the *Florence* Court held

that the search procedures at issue "struck a reasonable balance between inmate privacy and the

needs of the institutions" where the detainees were placed in general population.  566 U.S. at

339.

Palmer acknowledges *Florence* but cites two Fifth Circuit cases decided before it in

which the court found strip-search policies unconstitutional.  *See* Pl.'s Mem. [28] at 8 (citing

*Stewart v. Lubbock County*, 767 F.2d 153 (5th Cir. 1985); *Williams v. Kaufman County*, 352 F.3d

994 (5th Cir. 2003)).  To the extent that those decisions conflict with *Florence*, *Florence* controls.  But Palmer's case raises a wrinkle because it is unclear whether she should have been placed in general population.  Plus, there is a plausible claim that the County's longstanding issues reflect an intent to punish.  Indeed, Jefferson's comments at the scene suggest that he thought she would be punished there.  Given all this, the Court finds that the strip search might plausibly be part of a bigger picture.  So, while Hinds County may ultimately have a strong argument on this claim, it should be explored through discovery.  *In re S. Scrap Material Co., LLC*, 541 F.3d at 587.

IV.    Conclusion

The Court has considered all arguments.  Those not addressed would not have changed the outcome.  For these reasons, Hinds County's motion for judgment on the pleadings [19] is granted as to the abandoned claims but otherwise denied.  Jefferson's motion [22] is granted as to the abandoned claims and the claim under 42 U.S.C. § 1985(3).  It is otherwise denied.  Palmer may move for leave to amend the § 1985(3) claim within 15 days of this order.  If no motion is filed, then the parties are directed to contact the chambers of United States Magistrate Judge F. Keith Ball within 20 days of this Order to re-set the case-management conference.

**SO ORDERED AND ADJUDGED** this the 18th day of October, 2023.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE