IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

AQUINTA PALMER                                          PLAINTIFF

vs.                                    Civil Action No. 3:22-cv-00508-DPJ-ASH

JEREMY JEFFERSON, *et al.*                              DEFENDANTS

## MEMORANDUM OF AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO CITY OF JACKSON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [93]

The Plaintiff, Aquinta Palmer, submits this Memorandum of Authorities in opposition to the City of Jackson's Motion for Summary Judgment. Defendants fail to meet their burden under Rule 56 of the Federal Rules of Civil Procedure, as material factual disputes remain on Plaintiff's claims under 42 U.S.C. § 1983, including excessive force, wrongful arrest, retaliatory arrest and municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

## FACTS

In the early morning hours of July 17, 2021, Plaintiff was arrested for protesting the unreasonable and unconstitutional use of force by Officer Jeremy Jefferson against another citizen, Carmen Winford. Ms. Winford was handcuffed on the ground, and Officer Jefferson was poised to strike her with an ASP baton, because he was having trouble getting her into his patrol car. Plaintiff spoke up against Officer Jefferson's actions.

When Plaintiff initially entreated Officer Jefferson not to strike her handcuffed friend, Jefferson instructed Plaintiff to back up, which she did.[1] But, she continued to verbally protest Officer Jefferson's unreasonable use of force. Plaintiff was standing approximately 6 to 8 feet behind Officer Jefferson when he put Ms. Winford in his patrol car.[2] Plaintiff never touched Officer Jefferson.[3] After Officer Jefferson finished putting Ms. Winford in his patrol car, he immediately turned around and advanced on the Plaintiff violently shoving her in the chest and knocking her backwards several feet.[4] After the initial shove, Officer Jefferson continued advancing on the Plaintiff and shoved her again, this time knocking her out of her shoes.[5] Once again, Officer Jefferson quickly closed the gap and continued screaming in Plaintiff's face to "Have a good night!"[6]

After the second push, Corporal Tanisha Gallion, who had just arrived on scene, approached Jefferson and Plaintiff and told Jefferson to stand down and let her handle the situation.[7] Corporal Gallion was acting as the supervising officer on scene.[8] Initially, Jefferson backed off, but as soon as Plaintiff asked for his name and badge number, he circled back around and indicated to Corporal Gallion that he was going to take Plaintiff to jail.[9]

---

[1] Ex. "A", Palmer Depo., at 38:1-3, 10-13.
[2] Ex. "B," Bystander Video, *supra*.; Ex. "C," Fareno Jackson Affidavit
[3] Ex. "A," *supra*.; Ex. "C."
[4] Dk [94-6] (Ex. 12) Jefferson Bodycam, at 0:03:24—0:03:34 ; see also Ex. "B," Bystander Video, at 0:00:43—0:00:53.
[5] Ex. "B," Bystander Video, *supra*.
[6] *Id.*
[7] Dk. [93-5] (Ex. 5) Gallion Depo., at 19:17—20:18.
[8] Dk. [94-6] (Ex. 12) Jefferson Bodycam, at 0:19:12 - 0:19:18 (indicating that Cpl. Gallion was the acting supervisor on the scene).
[9] Dk. [94-5] (Ex. 11) Gallion Bodycam, at 0:01:42—0:01:51.

It is undisputed that Officer Jefferson had no right to strike a helpless, handcuffed detainee. Officer Jefferson admitted as much.[10] Officer Jefferson further admitted that Plaintiff's verbal protest was neither problematic nor grounds for arrest.[11] Contrary to Defendants' statement of facts, Plaintiff was not telling Officer Jefferson "to let Ms. Winford go." She was telling Officer Jefferson – correctly – that he could not strike a detained citizen with his baton.[12] She also reminded him that he had taken an oath to protect and serve.[13] Officer Jefferson confirmed in his testimony that these are the only statements that Plaintiff made to him.[14]

Officer Jefferson's stated reason for Plaintiff's arrest – the sole reason – was because she allegedly assaulted him by "snugging" or pulling at his shirt while he was placing Winford in his patrol vehicle.[15] Notably, this is a different characterization than what Officer Jefferson told the Sargeant Brett Bailey during the Internal Affairs interview. In that interview, Jefferson told Sgt. Bailey that Plaintiff "hit" him.[16] However, whether classified as a "snug" or a strike, Plaintiff categorically denies ever touching Jefferson.[17] In fact, when he initially asked her to back up, she did; and after she backed up, Officer Jefferson advanced on her and assaulted her.[18] The video taken by a bystander, Fareno Jackson, clearly shows the

---

[10] Dk. [93-1] (Ex. 1) Jefferson Depo., at 33:20-25.
[11] *Id.*, at 17:1-12 (citizen's right to observe and verbally protest); 32:12-14 (Plaintiff's verbal protest "wasn't a problem"); 81:13-20 (decision to arrest was based entirely on alleged "snugging…and pulling at me").
[12] Ex. "A," Palmer Depo., at 32:20—33:3.
[13] Dk. [93-1] (Ex. 1), Jefferson Depo, at 42:2-6.
[14] *Ibid.*
[15] *Id.*, at 53:16-25.
[16] Dk. [94-1] (Ex. 7) Jefferson IA Interview, at 0:03:54—0:04:02.
[17] Ex. "A," Palmer, at 35:3-8.
[18] *Id.*, at 38:1-3, 10-13.

Plaintiff standing well out of reach of Officer Jefferson as he was putting Ms. Winford in the patrol car.[19]

Officer Jefferson turned around, approached the Plaintiff and shoved her twice, knocking her out of her shoes.[20] Defendants attempt to characterize this as a "two-handed check" to "maintain a reactionary gap" is absurd. The video clearly depicts Jefferson *closing* the gap between he and Plaintiff so he could shove her.[21] Officer Jefferson continued advancing on Plaintiff, started yelling in her face, then, just as Corporal Tanisha Gallion was approaching, Officer Jefferson shoved Plaintiff again.[22] At that point, Cpl. Gallion tried to take over and told the Plaintiff to "talk to me."[23] Plaintiff was visibly upset after having been assaulted by Officer Jefferson.[24] Jefferson walked away when Cpl. Gallion arrived, but just as Plaintiff started asking for his badge number, he came back and for the first time said he was going to arrest the Plaintiff.[25] He did not state his reason for arresting her. A few seconds later, Officer Jefferson can be heard stating, "I touched her, she ridin'," which meant he was arresting her, apparently because he had assaulted her.[26]

During this exchange, Cpl. Gallion can be heard saying over and over, "I got it. I got it…", clearly directing Jefferson to stand down.[27] Jefferson ignored Cpl. Gallion's directive and continued to try to arrest the Plaintiff without ever stating

---

[19] Ex. "B," Bystander Video, at 0:00:35—0:00:43.
[20] *Id.*, at 0:00:43—0:00:50.
[21] *Id.* at 0:00:50—0:00:55.
[22] *Ibid.*
[23] Dk. [94-5] (Ex. 11) Gallion Bodycam, at 0:01:25—0:01:50
[24] *Ibid.*
[25] *Id.*, at 0:01:50—0:02:00.
[26] *Id.*, at 0:02:00—0:02:05.
[27] *Ibid.*

the grounds for arrest. In fact, Officer Jefferson never told the Plaintiff why she was being arrested, and he did not tell Cpl. Gallion why until several minutes later when he falsely told her that Plaintiff had been "fighting" with the officers and assaulted Jefferson.[28] Jefferson would later admit in his deposition that Plaintiff was not fighting with anyone.[29]

As Cpl. Gallion was trying to get Jefferson to stand down, Jefferson continued trying to grab the Plaintiff and put handcuffs on her, eventually slamming her onto the hood of a car and taunting her saying, "I wish you would…"[30] Contrary to Defendants' characterization of "placing" Plaintiff on the car, or Plaintiff falling toward the car, Cpl. Gallion stated in her interview with Internal Affairs that Jefferson "just slung [Plaintiff] on the car."[31] The bystander video resolves any doubt about what happened: Jefferson forcibly slammed Plaintiff on the car.[32] Cpl. Gallion told Jefferson, "We not gonna do that…"[33] A few seconds later, Officer Draine came to assist. As Plaintiff pleaded with Officer Draine to listen to Cpl. Gallion, Draine Tased the Plaintiff causing her to fall to the ground, and while she was on the ground, the sound of the Taser can be heard three more times, followed by the Plaintiff saying that she was urinating on herself.[34]

The majority of the facts of this incident as described above are taken directly from the video footage of the incident and, thus, must be given greater weight than

---

[28] Dk. [94-6] (Ex. 12) Jefferson Bodycam, at 0:28:15—0:29:06.
[29] [93-1] (Ex. 1) Jefferson Depo., at 76:1-4.
[30] Dk. [94-5] (Ex. 11) Gallion Bodycam, at 0:02:05—0:02:20.
[31] Ex. "D," Gallion IA Interview, at 0:04:54—0:05:23.
[32] Ex. "B," at 0:01:35—0:01:40
[33] *Ibid.*
[34] *Id.*, at 0:02:45—0:03:15.

the Defendants' version of facts. See *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

## SUMMARY JUDGMENT STANDARD

"Pursuant to [Rule 56], the movant first has to address the facts and seek to persuade the court that all of the 'material' facts are undisputed." *See . Williams v. City of Yazoo, Miss.*, No. 3:15-CV-103-HTW-LRA, 2020 WL 6122357, at *11 (S.D. Miss. Oct. 17, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A fact is material where its resolution could affect the outcome of the action. *Id.* (internal citations omitted). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The court must view the facts, evidence, and all inferences drawn therefrom in the light most favorable to the nonmoving party." *Williams, supra.*, at 12. Important to the Court's analysis of the facts in this case, "if there is video evidence that 'blatantly contradicts' the [defendants'] allegations, the court should not adopt the [defendants'] version of the facts; instead, the court should view those facts in the light depicted by the videotape." *Craig, v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022).

Defendants cannot meet their threshold burden of demonstrating that all of the materials facts are undisputed. Many of the facts relied upon by the Defendants

are directly refuted by video evidence, and there is testimony and documentary evidence disputing many more.

## QUALIFIED IMMUNITY

"Once a defendant properly pleads qualified immunity, the burden of proof shifts to the plaintiffs to negate the defense. To meet this burden, the plaintiffs must establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Craig*, 49 F.4th at 409.

The Defendants are not entitled to qualified immunity in this case, because their actions violated Plaintiff's First and Fourth Amendment rights, and those rights were clearly established at the time of the officers' conduct. See *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) ("It is beyond dispute that [a citizen's] right to be free from excessive force during an investigatory stop or arrest was clearly established in August 2007.")

## ARGUMENT

### 1.    Excessive Force Claims Against Officers Jefferson and Draine

"The Fourth Amendment's protection against unreasonable search and seizure includes the right to be free from the use of excessive force by law enforcement." *Jordan v. Liddell,* No. 3:16CV467TSL-RHW, 2017 WL 4582343, at *3 (S.D. Miss. Oct. 13, 2017) (quoting *Ikerd v. Blair*, 101 F.3d 430,433–34 (5th Cir. 1996)). "To prevail on a Section 1983 excessive force claim, a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was

clearly excessive, and (3) the excessiveness of which was clearly unreasonable."
*Ducksworth v. City of Laurel, Miss.*, No. 2:20-CV-114-KS-MTP, 2021 WL 4504692,
at *3 (S.D. Miss. Oct. 1, 2021).

> Specifically, the court should consider the severity of the crime at
> issue, whether the suspect poses an immediate threat to the safety of
> the officers or others, and whether he is actively resisting arrest or
> attempting to evade arrest by flight. . . The inquiry is confined to
> whether the officer was in danger at the moment of the threat that
> resulted in the use of force. . . .Any force found to be objectively
> unreasonable necessarily exceeds the de minimis, threshold, and,
> conversely, objectively reasonable force will result in de minimis
> injuries only. As long as a plaintiff has suffered some injury, even
> relatively insignificant injuries and purely psychological injuries will
> prove cognizable when resulting from an officer's unreasonably
> excessive force.

*Id.*

Defendants concede for purposes of the summary judgment analysis that
Plaintiff was injured by the officers' conduct. In fact, Plaintiff did sustain both
physical and psychological injuries, including lacerations to her hand and foot,
chronic back pain, and post-traumatic stress disorder. Thus, the only remaining
question is whether the force was excessive and objectively unreasonable.
Defendants assert no excessive force was used, citing the officers' reasonable actions
under Fourth Amendment standards. However, substantial factual disputes exist
on this point.

The alleged crimes in question were failure to obey a police officer,
interference with arrest, assault, and resisting arrest. Plaintiff denies ever touching
Officer Jefferson before he shoved her, calling into question whether any assault
ever occurred. Plaintiff contends the video evidence – both Officer Jefferson's body

camera and the bystander video by Mr. Jackson – refute Officer Jefferson's claim of assault. But, even if we indulge the Defendants and assume the assault allegation to be true, the nature of the alleged assault and interference with arrest – which according to Jefferson consisted entirely of Plaintiff "snugging" or tugging at his shirt while he was loading Ms. Winford in his patrol car – was not sufficient to warrant the violence with which Jefferson reacted, especially in light of the fact that Plaintiff was clearly standing out of reach of Jefferson by the time he turned and assaulted her. In other words, even if Plaintiff had "snugged" at Jefferson's shirt, she had ceased doing this and moved out of reach of Officer Jefferson before he made the decision to violently shove her. This was not a split-second decision in the heat of a "tense, uncertain and rapidly evolving" situation. See *Graham v. Connor*, 490 U.S. 386, 397 (1989). Indeed, after Jefferson loaded Winford into his patrol car, the entire incident for which Jefferson had been called to the scene was resolved. Officer Jefferson's assault on the Plaintiff was at worst an intentional act of malice and at best an emotional reaction. In either case, it was objectively unreasonable, as were all of the actions that followed, including shoving her two more times, slamming her on a car, and Tasing her.

Plaintiff posed no threat to Officer Jefferson at the moment he decided to shove her. Officer Jefferson told Plaintiff to back up, and she did, though she continued her verbal protest of what appeared to be Officer Jefferson's imminent assault on a handcuffed detainee. Nor did Plaintiff pose any threat to Officer Jefferson when he slammed her on the hood of a car. On the contrary, a senior

officer was actively trying to keep Jefferson away from the Plaintiff when he violently grabbed Plaintiff and slammed her on the car. Finally, by the time Officer Jefferson ordered Plaintiff to be Tased, the video shows that she was calm and collected and merely telling the officers to listen to their superior, Cpl. Gallion, who had repeatedly tried to stop the assault.

As to the unreasonableness of Jefferson's actions, there is indisputable video evidence showing Officer Jefferson shoving Plaintiff so hard that she came out of her shoes, then slamming her onto the hood of a car, then ordering or allowing her to be Tased. Additionally, an independent eyewitness, Fareno Jackson, described how Officer Jefferson struck him with a baton without provocation, before he focused his rage on the Plaintiff.[35] The record evidence shows that Officer Jefferson's actions almost from the moment he arrived on the scene were unreasonable and excessive.

Officer Jefferson does not dispute that he shoved the Plaintiff – or "two-hand checked" her in his words – but tries to justify it by claiming that the Plaintiff assaulted him and that he was trying to create a "reactionary gap" between himself and the Plaintiff. Conversely, Plaintiff categorically denies ever touching Officer Jefferson, and the video evidence backs her up.

Officer Jefferson also tries to justify slamming – or "placing" in his parlance – Plaintiff on the hood of a car and Tasing her by arguing that she was resisting

---

[35] Ex. "C," Jackson Affidavit. Notably, Officer Jefferson admitted that he struck Mr. Jackson with his baton. Jefferson claims Jackson tried to pull him off Carmen Winford, which Mr. Jackson denies. The video is a little jumpy, but a careful inspection reveals that Mr. Jackson never touched Officer Jefferson. Like the Plaintiff, he merely pleaded within him not to be so rough with Ms. Winford.

arrest. This argument ignores the underlying fact that the arrest itself was unlawful, giving Plaintiff every right to resist. "One has an undoubted right to resist an unlawful arrest . . . ." *United States v. Di Re*, 332 U.S. 581, 594, 68 S. Ct. 222, 92 L. Ed. 210 (1948); see also *Taylor v. State*, 396 So. 2d 39, 42 (Miss. 1981) ("A person has the right to use reasonable force to resist an unlawful arrest.") If Officer Jefferson lacked probable cause to arrest Plaintiff, then her resistance to the unlawful arrest cannot serve as the basis for a lawful arrest. See Miss. Code Ann. § 97-9-73 (resisting arrest requires proof suspect "obstruct[ed] or resist[ed] by force, or violence, or threats, or in any other manner, his <u>lawful</u> arrest") (emphasis added).

Officer Draine's use of the Taser was likewise unreasonable and unnecessary. Aside from the fact that Plaintiff was resisting an unlawful arrest, Draine used the Taser in violation of the department's policy. The Taser policy of the Jackson Police Department provides that the Taser is an intermediate weapon that directly counters "active aggression", which is defined under the Use of Force Continuum as "physical actions and/or assault on an officer."[36] The Taser policy further provides that "Special attention should be afforded to the principle that officers may enter the continuum at any level that represents a reasonable response to the perceived threat posed by the subject."[37]

As explained above, the Plaintiff posed no threat to any of the officers when she was Tased. She had just been shoved and slammed on the hood of a car, yet made no threatening moves against the officers. She offered nothing but verbal

---

[36] See Ex. "E," Taser Policy, at 5(a); and Ex. "F," Use of Force Policy, at pg. 5.
[37] Ex. "E," at 5(b).

protest and, at most, passive resistance. Importantly, while Jefferson and Draine were trying to handcuff her, Cpl. Gallion was trying to stop them, sending mixed signals to the Plaintiff. Plaintiff can be heard pleading with Officers Draine and Jefferson to listen to Cpl. Gallion in the moments before Draine Tased her. Then, after she fell to the ground from the initial stun of the Taser, Draine Tased her at least three more times, to the point that she urinated on herself. There is certainly enough evidence here for a reasonable jury to find that Officer Draine's actions were excessive and objectively unreasonable.[38]

Perhaps most damning to the Defendants' summary judgment argument is the existence of several departmental memos indicating that the officers violated the department's use of force policies. Sergeant Gregory Jackson found, "that the use of force was not justified and disciplinary action is warranted."[39] Precinct 4 Commander Obie Wells similarly found that both Draine and Jefferson had violated the department's use of force policies and that disciplinary action was warranted.[40] In addition, Cpl. Gallion also believed the use of force was excessive.[41] Cpl. Gallion's opinion is particularly persuasive in light of the fact that she was at the scene.

## 2.    Unlawful Arrest

"The right to be free from arrest without probable cause is a clearly established constitutional right." *Jordan*, No. 3:16CV467TSL-RHW, 2017 WL

---

[38] Defendants' reliance on the opinions of their law enforcement expert, Mark Dunston, are not competent summary judgment evidence, and this Court should disregard Mr. Dunston's report in its entirety in its analysis of the Defendants' arguments. See *Smith v. Palafox*, 728 F. App'x 270, 276 (5th Cir. 2018)

[39] Ex. "G," Sgt. Jackson Memo.

[40] Ex. "H," Wells Memo re: Jefferson; Ex. "I," Wells Memo re: Draine.

[41] Ex. "D," Gallion IA Interview, at 0:07:17—0:07:30.

4582343, at *3. "The presence of probable cause is a mixed question of fact and law." *United States v. Wadley*, 59 F.3d 510, 512 (5th Cir. 1995). "[W]here facts relied upon to show probable cause in a § 1983 action are controverted, they must be resolved by the jury before controlling legal principles can be applied. It is axiomatic that the jury is the sole judge of the facts of the case." *Garris v. Rowland*, 678 F.2d 1264, 1270 (5th Cir. 1982) (citing 47 Am.Jur.2d *Jury* § 3 (1969)).

Defendants argue probable cause supported Plaintiff's arrest for a myriad crimes. But, the facts and circumstances giving rise to probable cause are disputed and, therefore, must be decided by the jury. Defendants assert that Officer Jefferson had probable cause to arrest Plaintiff for four separate crimes – assault on an officer, interference with an officer's duties, failure to obey/disorderly conduct, and resisting arrest. The evidence suggests otherwise.

a.    *Assault and Interference with Police Duties*

These two crimes are intertwined, because they arise from the same alleged conduct. Officer Jefferson testified that Plaintiff assaulted him and interfered with his duties when she "snugged" or pulled on his shirt as he was putting Ms. Winford in his patrol vehicle. The only other evidence of an alleged assault came from Officer Draine who testified in his deposition that he saw the Plaintiff assault Officer Jefferson. Yet, in his Internal Affairs interview, Officer Draine said he did not see the altercation that led up Jefferson trying to arrest the Plaintiff.[42] He specifically said that when he turned around, he saw Plaintiff resisting Jefferson's attempt to

---

[42] Dk. [94-2] (Ex. 8) Draine IA Interview, at 0:04:30—0:04:56.

arrest her, which necessarily occurred after the alleged assault at Jefferson's vehicle.[43]

The video evidence contradicts the accounts of Jefferson and Draine, as does the testimony of Plaintiff and eyewitness, Fareno Jackson, who both swear that Plaintiff never touched Officer Jefferson. Moreover, neither Officer Jefferson nor Officer Draine included any allegation of assault or details of the alleged assault in any of their post-incident reporting.[44]

        b.    *Failure to Obey/Disorderly Conduct*

Officer Jefferson testified that Plaintiff failed to obey his commands to "leave and get away" and failed to obey his command to put her hands behind her back.[45] We need not rely on Jefferson's recollection. Jefferson's body camera footage reveals that he first told the Plaintiff to "get back."[46] He did not tell her to leave. Plaintiff testified that she complied with that order by moving back, and the video taken by Fareno Jackson corroborates this testimony showing the Plaintiff several feet behind Jefferson as he closed the door to his patrol car. The next "command" Officer Jefferson gave was for Plaintiff to "Have a good night!", which he exclaimed to her as he proceeded to shove her several times.[47] To the extent that this could even be considered a lawful order – which is doubtful given the circumstances – Officer Jefferson never gave Plaintiff the opportunity to comply. He shoved her so hard she

---

[43] *Ibid.*

[44] See Ex. "J," Jefferson Use of Force Report; Ex. "K," Jefferson Memo; Ex. "L," Uniform Incident Report; Ex. "M," Draine Memo.

[45] Dk. [93-1] (Ex. 1) Jefferson Depo, at 66:22—67:3.

[46] Dk. [94-6] (Ex. 12) Jefferson Bodycam, at 0:02:52—0:02:58.

[47] Dk. [94-6] (Ex. 12), at 0:03:24—0:03:38.

came out of her shoes, after which she asked if she could retrieve her shoes.[48] It was at this time Cpl. Tanisha Gallion approached and tried to take control of the situation.

More importantly, the Defendants have no evidence that Plaintiff intended to cause or provoke a breach of the peace by protesting Officer Jefferson's actions, which is one of the central elements of the disorderly conduct statute. Miss. Code Ann. § 97-35-7 ("Whoever, *with intent to provoke a breach of the peace,* or under such circumstances as *may lead to a breach of the peace*, or which m*ay cause or occasion a breach of the peace* . . .) (emphasis added).

Plaintiff did nothing more than verbally protest when she saw Officer Jefferson poised to strike a defenseless civilian with his ASP baton. Some of her language may have been colorful, but it could not reasonably be construed as violent or threatening. *See Jones v. State*, 798 So. 2d 1241, 1247-48 (Miss. 2001) ("verbally accusatory and profane remarks" to police officer without evidence of a threatened breach of the peace or a crime about to be committed insufficient to establish probable cause for arrest). Plaintiff's words were plain in their meaning: she was calling Officer Jefferson out for what appeared to be an imminent use of unconstitutional force against a helpless detainee. Indeed, if Plaintiff had not been present, Officer Jefferson may well have struck Ms. Winford with his baton. If anything, Plaintiff was *preventing* a crime from occurring.

     c.    *Resisting Arrest*

---

[48] *Ibid.*

Defendants cite as additional grounds for the arrest that Plaintiff was resisting. However, Plaintiff was resisting an otherwise unlawful arrest, which was her absolute right under federal and state law. "It would be the ultimate bootstrapping for officers to effectuate an unlawful arrest and then charge someone for resisting it." See *Ducksworth v. Landrum*, 62 F.4th 209, 218 (5th Cir. 2023) (citing *S.M.K.S. v. Youth Ct. of Union Cnty.*, 155 So. 3d 876 (Miss. Ct. App. 2014)).

Plaintiff contends that the circumstantial evidence overwhelmingly supports the fact that Officer Jefferson used the crimes of interference with police duties, disobeying a police officer, assault, and resisting as mere pretexts for what was ultimately Officer Jefferson's retaliatory animus against the Plaintiff for protesting how he was treating his detainee, Ms. Winford. Because there are genuinely disputed material facts, this is ultimately a question for the jury to resolve, not the Court. Accordingly, summary judgment must be denied for this claim.

### 3.    Retaliatory Arrest – First Amendment

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. Speech is often provocative and challenging.... [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987) (citations omitted).

Plaintiff exercised her First Amendment right to criticize and challenge Jefferson's use of excessive force against a helpless civilian in handcuffs. Jefferson

retaliated against the Plaintiff by assaulting her. This is a clear case of unconstitutional retaliation. See *Norwell v. City of Cincinnati, Ohio*, 414 U.S. 14, 16 (1973). ("Upon this record, we are convinced that petitioner was arrested and convicted merely because he verbally and negatively protested Officer Johnson's treatment of him.") The Court in *Norwell* found that there was no use of abusive language or fighting words. The same is true here, where Plaintiff merely pleaded with Jefferson not to strike her friend who was already handcuffed. The only other statements by the Plaintiff were that she wanted to get her shoes and that she had done nothing wrong. "Surely, one is not to be punished for nonprovocatively voicing [her] objection to what [s]he obviously felt was a highly questionable detention by a police officer." *Id.*

The evidence shows that Plaintiff did not engage in any threatening or violent behavior towards Jefferson or any other officer and that she was not engaged in any criminal activity whatsoever. While Officer Jefferson denies a retaliatory animus, his words and his actions strongly suggest otherwise. First, he can be heard on video stating that he had to arrest the Plaintiff because *he touched her*. Then, after slamming her on the car, he taunts her, saying "I wish you would," as if trying to provoke a violent reaction from the Plaintiff to give him a reason to inflict further harm on her. Finally, the fact that the two other women who were arrested, Morgan Catchings and Carmen Winford, were released that same day while Plaintiff was taken to the county detention center and left for the weekend is

a strong indicator that Officer Jefferson had a particular bone to pick with the Plaintiff.

The circumstantial evidence of Officer Jefferson's retaliatory animus coupled with the lack of probable cause for Plaintiff's arrest are sufficient to create a jury question on this issue.

### 4. Municipal Liability under *Monell*

A municipality may be held liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), where an official policy, custom, or failure to train causes a constitutional violation. Liability may be established by showing: (1) an official policy or widespread custom, (2) a policymaker's deliberate indifference, and (3) causation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

#### a. *The City's Failure to Provide Continuing Use-of-Force Training Shows Deliberate Indifference*

A municipality's failure to train its officers may constitute a policy of deliberate indifference if the failure is "closely related" to the alleged constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). Here, the Precinct Commander testified that the department does not require any continuing use-of-force training outside of the police academy. The Supreme Court has recognized that when a city provides no training on an issue likely to result in constitutional violations, liability may attach. *Id.* at 390.

Plaintiff has presented evidence that the officer's use of force violated the department's policy, and ongoing training could have prevented the unconstitutional conduct. The lack of continuing training creates an obvious risk

that officers will misapply force policies in the field, leading to excessive force incidents, which is precisely what occurred here. On these facts, a jury could reasonably conclude that the City's failure to implement any continued use-of-force training amounts to deliberate indifference. Moreover, the department's failure to discipline Officer Jefferson or Officer Draine, despite two of their supervisors finding that they had violated use of force policies and that disciplinary action was warranted, is evidence of the City's ratification of the unconstitutional conduct.

       b.    *The Department's Policy of Mandatory Arrest After Use of Force Is an Unconstitutional Custom*

Municipal liability may also be established when an unconstitutional custom is so widespread that it has the force of law. *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). Plaintiff has presented direct evidence of such a custom: the involved officer expressly testified that department policy mandates the arrest of any civilian against whom force is used. Officer Jefferson justified the practice on the belief that failing to arrest a civilian after using force would expose him and/or the City to civil liability.[49]

This admission is sufficient to establish a municipal custom or practice. In *Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984), the Fifth Circuit held that an unofficial policy, if widespread and sanctioned by the municipality, can establish *Monell* liability. Here, the officer's testimony directly links his unconstitutional conduct—arresting Plaintiff without probable cause—to an official departmental

---

[49] Dk. [94-6] (Ex. 12) Jefferson Bodycam, at 0:20:20 - 0:20:35 ("Our policy, though, if I touch you, you have to ride.") He also made similar comments to Cpl. Gallion when he was trying to handcuff the Plaintiff. Dk. [94-5] (Ex. 11) Gallion Bodycam, at 0:02:00—0:02:25 (In this portion of the video, Officer Jefferson twice tells Cpl. Gallion that Plaintiff is going to jail *because he touched her*.)

practice. Moreover, the department's investigation into the subject incident through its internal affairs division overlooked key witnesses, ignored inconvenient facts, and essentially rubber-stamped Officer Jefferson's conduct amounting to tacit approval of his actions in conformity with the departmental practice or custom of arresting anyone against whom force is used. The department's failure to correct or prevent this practice amounts to deliberate indifference.

     c.    *Causation: The City's Policy and Failure to Train Were the Moving Force Behind Plaintiff's Constitutional Deprivation*

To impose *Monell* liability, Plaintiff must show that the policy or failure to train was the "moving force" behind the violation. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010). The evidence shows that (1) the officer arrested Plaintiff without probable cause pursuant to a department-wide policy, and (2) the lack of continuing use-of-force training allowed the officer to misapply force policies without accountability. A jury could find that these deficiencies were the direct cause of Plaintiff's constitutional injury.

## CONCLUSION

Summary judgment is inappropriate where genuine disputes exist as to material facts. Video evidence, testimonies from Officers Jefferson and Draine, Corporal Gallion, Plaintiff, and eyewitness Fareno Jackson, establish conflicting narratives concerning the events surrounding the arrest of the Plaintiff on the night in question, as well as the City of Jackon's official policy that directly caused her arrest. For this reason, summary judgment should be denied.

Filed: January 31, 2025.

Respectfully Submitted,

**AQUINTA PALMER**

By:  *s/ Michael R. Kelly*

W. Matthew Thompson – MS Bar # 101901
*matthew@thompsonaddison.com*
Michael R. Kelly - MS Bar # 103547
*michael@thompsonaddison.com*
Thompson Law Firm, PLLC
2060 Main Street
Madison, MS 39110
Phone: 601.850.8000
Fax: 601.499.5219

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2025, I electronically filed the foregoing

motion with the Clerk of the Court using the ECF system which sent notification of

such filing to all counsel of record.

*s/ Michael R. Kelly*